Start the clock. May it please the court. My name is Douglas Honnold. I represent Appellant Northern Plains Resource Council, and with the court's indulgence, I would request to reserve seven minutes for rebuttal. Make it 13 and seven. I plan to address four issues in my opening statement. First, why isn't this case time barred? Second, did BLM do the appropriate environmental analysis in 1994? Third, did BLM do the appropriate resource management plan decision? Did it restrict coal bed methane in 1994? And fourth, does the 2003 EIS solve the problems? First, why isn't this case time barred? In other words, why isn't this really a challenge to the 1994 resource management plan EIS and record of decision? Our challenge is to these leases, individual leases. It's not time barred, because all of the leases were issued within the six-year statute of limitations. In this case, we challenge primarily the individual leasing decisions that BLM made, not the big-picture zoning decisions that are made across an entire resource planning area, but rather a series of individual decisions made by the federal government and the federal government to enter into a contract with an oil and gas company to explore and develop all of the mineral estate, which includes coal bed methane gas. The basic problem here is that the federal government sold away the development rights to the oil company. I thought the 1994 permit provided for these little leases that you're challenging. The 1994 resource management plan, if I'll jump to that issue, did it restrict coal bed methane to test wells or exploration wells only? The answer is absolutely not. Well, but if the appellees concede that their leases granted only limited exploratory drilling rights, which apparently they do, why doesn't the 1994, all these RMP, EIS cover this drilling? Your Honor, they do not flatly concede that. If the record was that the, at the time of lease issuance, that there was a binding restriction that imposed a stipulation that restricted coal bed methane development to exploration only, that would be one set of facts. I want to underscore this, because embedded in this issue are both questions of law and questions of fact. And I want to speak first to the question of fact. What did BLM do in 1994? And as a matter of fact, BLM did not restrict coal bed methane to test wells in the 1994. I've been confused the moment I picked up your brief, because the issues you list in your brief don't seem to me to relate to what the trial court decided. The trial court said they had limited development rights. But on appeal, you're arguing some other case. You're not arguing that they don't have limited development rights. You're saying the trial court said they had broad development rights, and you're arguing that case. Am I missing something? Am I on the wrong wavelength or what? I think the district court was wrong. And this was a new theory that was advanced in the district court by the law companies. I don't think really it had the full fleshing out. Perhaps it still hasn't had the full fleshing out. That's what they held. So if the district court held that it only had limited rights and the other side didn't appeal from it, then they only have limited rights. That's not right. Basically, the situation is that their theory is that their rights were restricted by the 1994 resource management plan. Then they say we did a new EIS, and lo and behold, all of a sudden we have full field development rights. But when they did that new EIS in 2003, the record is abundantly clear. BLM said we've already granted the development rights to the oil companies for the entire mineral estate. And that's what I want to explain when it comes to the way BLM does business. But is that before the court? The district court holds they have limited rights. It's absolutely before the court, because we have argued the case as if the district court held they had complete rights or full development rights. It seems to me you're arguing some other case than what the district court decided. Our case is that when BLM issued these leases, they granted full development rights for coal bed methane without restriction and that they needed to do an environmental analysis, they needed to inform the ranchers that they were leasing the subsurface estate, they needed to assess is there a way to have coal bed methane development that doesn't destroy your drinking water supply, that doesn't put a compressor station or a road right next to your ranch house. Sounds like we're now getting the jury argument. But all this was up for discussion in 94. And let's turn to what happened in 1994. Why should we? It's barred by the statute of limitations. The only thing that matters to me is whether what's challenged is covered by 1994. And when I look at page 1789 of the excerpts, page 4 of the chapter, there are a whole bunch of page numbers. It's in chapter 1 of the oil and gas RMPEIS amendment. And it says the reasonably foreseeable development projections can accommodate the drilling of test wells and initial small-scale development of coal bed methane. And all the ranchers and environmentalists and everybody who had a concern with that could fight about it during the hearing. So I can't see why I should care what happened in 94, because it's all barred by limitations. Water over the dam. Because the question is, in 1997, when BLM issued these leases, what development rights did it give to the companies and how did BLM treat them since 1997, the leases that were challenging, 97 to 2001? As an affirmative defense, the appellees say, well, it was restricted and the district court agreed. But the district court was wrong. If you turn to page 323 of the excerpts of record, there's a discussion of the decision, the record of decision that BLM made in 1994. And the record of decision, BLM said, we will decide whether these lands are open to leasing with a standard stipulation. I've got page 323. What are we looking at on 323? Oil and gas leasing development is the heading. Underneath it, it says basically the decision being made is at the top. The decision being made, oil and gas leasing. One, two, and three. They say leases that are going to be leased with the standard stipulation. Means you've got the full rights of development, all the mineral resources. Two, areas that are going to be leased with minor stipulations. Three, areas that we're going to say no to development. And critically, BLM's approach is that if we do not impose stipulations, that we have the right to develop. So, for example, a recent case that was cited by the appellees, a U.S. Supreme Court case that just happened to be cited by the Wilderness Alliance, Justice Scalia cited to the BLM's land use planning handbook. And this is not in the briefs, because it was just cited. And in that, there's the BLM, as they advise their line officers what they're supposed to do, they have the exact same tripartite analysis. When you develop a plan, you decide what's open to leasing under standard lease forms, what needs some special stipulations, and what we're going to put off limits to oil and gas, which includes the CBM. And in that, BLM said, and I quote, this is from their own land use planning handbook, a determination that lands are available for leasing represents a commitment to allow surface use under standard lease terms and conditions unless stipulations constraining development are attached to the lease. There were no CBM-specific stipulations when they sold those in 1997 to 2001. There were no restrictions. And when BLM took a look in 2003 and did a supplemental analysis on the cold bed methane issue, they came to the exact same conclusion. They said, we're not going to consider in 2003 whether there are any special stipulations that are needed for cold bed methane to make sure that the oil companies don't sink a well right next to a ranch home, to ensure that the water doesn't dry up. I'm confused about this. I've just been looking at what you told me to look at, at page 323. It seems to be part of the oil and gas RMP EIS amendment record of decision from February 94. It means it's out of bounds for you. And then when I look over the language under what decision is being made, it looks like they made the decision in 1994 that you're challenging now. No, Your Honor. They made the decision to say, come on down, boys, these areas are open for leasing on standard stipulations. They issued the leases. They didn't impose any stipulations. They didn't even consider what to do with cold bed methane. And they never looked at, is there a way to have development of cold bed methane on, say, Herb Alderson's ranch in order to protect his livestock operations and protect his ranch. They never looked at that site specific. The plan said, go ahead and issue these leases with standard stipulations. That's exactly what they did. It says here that they were deciding whether areas should be open, whether they should be open subject to seasonal or other minor constraints, whether they should be open subject to no surface occupancy or similar major constraints, or whether they should be closed. And it seems like that would speak directly to what you're raising. I don't understand why it doesn't. Your Honor, we're challenging, did they take a hard look under NEPA at the environmental impacts of leasing under each one of these individual leases? Did they look at, are we going to protect the water supply, the drinking water supply? Are we going to allow a company to put a compressor station in a hay field? Is there a way to have development and protect the ranch at the same time? And they, as an affirmative defense, to say, well, we don't have to worry about that. Let's assume that they did everything wrong and everything terrible and they made decisions with utter hostility to the environment. Why didn't they do it in 94? They did. They absolutely did. What they said was, all of the lands we're contesting fall into this category. There may be a few acres, but almost all, they said, subject to standard lease forms, we're not going to restrict coal bed methane, one iota, we're not going to mention it in lease terms. They entered into a contract with the oil companies. That contract said you've got the right to develop all the resource, including... Well, that's not the way it was phrased. What are you saying, the trial, the trial clientifies authorizing only limited development, in fact, authorized unlimited development? BLM has said in 2003... Is that before the court? Yes, it is, Your Honor. In our brief. 2003, they did an environmental analysis across the entire state of Montana. My client said, can you please look at whether we're going to put any stipulations to protect my ranch from coal bed methane. BLM said, no, we're not going to look at that, because when we issued these leases, we didn't put any coal bed methane stipulations. They got the right to develop when the lease was granted, and that's the deal. And that's what we're challenged. Because somewhere the buck has to stop. Well, if they accepted the trial court's ruling and didn't appeal from it, then they would be exceeding the permit as defined by the statute of the appeal. Your Honor, we are challenging, did... The permit would mean, let me say this, they would be judicially stopped to argue the permit authorized limited development when they, when, or authorized unlimited development, when the trial court said, and they didn't appeal from it, that only authorized limited development. That's their case. We're appellants. Our case is, when you issue these leases, you have to do the environmental analysis that is coincident with the development right you're giving to the oil company. And we say, you never did that environmental analysis under your theory, you never will do it. And the only way 94 comes into play is they say, you don't have to worry about doing this environmental analysis when you issue the lease. And because our case is, they've never done that environmental analysis, they didn't do it in 1997, and they had to do it when they issued the lease. That was the time you could have imposed stipulations to protect these ranchers from coal bed methane. They never did it in 97. The only way that 94 comes up is by an affirmative defense of the appellees saying, everything is fine because we took care of this in 94 and imposed a limitation. And when you look at that decision... If it was like Judge Kleinfeld said, they did everything wrong in 94, and that's when they were supposed to do it, then you're out of court, right? I don't think they did... I mean, because you would have had to have contested it within the statute of limitations. I don't think they did everything wrong in 94. I think in 94, coal bed methane was just on the horizon. They didn't know it was a real problem. And so they didn't really take it into account. But come 1997, when they issued these leases, they knew, and the record is clear, they knew that coal bed methane had been exploding just across the border in Wyoming, and that the oil companies were going to use coal bed methane. In 1997, then the question was, are they going to impose any kind of stipulations in that contract with the oil company that's going to restrict development or not, and they failed to do so. And our case is, at that point, when you hand over the contract, have you done your duty to do the environmental analysis that ensures that there's a way to do business and protect the environment? They didn't do it then, and under their theory, they would never do it. And the rancher would never be able to say, don't put a compressor in my backyard. Thank you, counsel. Since we went 14.37, just make it ten minutes, or subtract that from whatever we had for rebuttal. Counsel? Good morning, Your Honors. My name is Sylvia Quast. I'm representing the Bureau of Land Management and the other federal appellees in this action. With me at counsel table is Mr. John Mitropoulos, and he's representing the Fidelity and Marathon appellees. I would like 15 minutes, and Mr. Mitropoulos will take five minutes. I'd like to start briefly by talking about the issue of time bar, and then move on to the nature of the lease right, which is really at the heart of Northern Plains arguments. With regard to the issue of time bar, the court understands it absolutely correctly. The issue before the court here is simply whether the RMP EIS document from 92 and 94 covers the activities that BLM in fact authorized on the ground. As we argued in our brief, it did. The issue of the adequacy of that analysis is not before the court. The lower court determined that that any of those attacks were time barred. We also made an argument in our brief about the fact that if you're going to be raising problems and criticizing the analysis, the time to do that is when the document, the draft document is before the agency. That's the case under Vermont Yankee. That's the case under Havasupai Tribe of this court. The appellants did not contest the argument in the reply brief, so I would say that they are double-dealing and fully barred from getting into issues of adequacy of the RMP EIS. Let's assume that there isn't any concession from failure to address it in the reply brief, that it just leaves it to us. Why isn't the case not time barred because the challenge is to recent specific permissions to drill rather than the general EIS in 94? The only thing that isn't time barred here is whether the leases and the APDs that were approved are covered under the 92-94 document. And what we're saying is they clearly are covered. And the court pointed to the language in the documents that say quite specifically, what we're considering in this document is initial test wells for CBM and initial small-scale development only. Full field development will not go forward without more additional environmental documentation here. It makes it very clear. All the parties to the leases understood that. We understood that. It's clear from the briefs that the lessees understood that as well. And in fact, that's exactly what happened on the ground here. No full field development went forward. And no one is contesting that here, not even Northern Plains. The only thing that's not on time barred challenge is, is the lease challenge within the restrictions of the 92-94 documents? Yes, and they are. Because any challenges to the permissions and restrictions in 92-94 would be time barred? That's correct. Okay. Got it. So let me go to talk a little bit about the nature of the lease rights here, since there have been a lot of allegations about what the nature of that right is. The court needn't go any further than our supplemental excerpts of record on page 27, where you can look at the lease document itself. There's a standard leasing form. And right above the signature line, it tells us exactly what the nature of the lease right is. It says, the lease is issued granting the exclusive right to drill for, mine, and mine only. Mine, extract, remove, and dispose of all oil and gas except helium in the lands described in the document. The next sentence says, rights granted are subject to applicable laws, the terms, conditions, and attached stipulations of this lease, the Secretary of the Interior's regulations, and formal orders in effect as of lease issuance. Clearly, there are other things that the right is subject to that it is limited by, other than just stipulations that are part of the lease. Applicable laws is one of those categories. And again, it's very clear, when you look at the applicable laws, one of those would be the Federal Onshore Oil and Gas Leasing Reform Act of 1987, which says, lessees may not go forward and do any drilling until they have submitted an application for a permit to drill, and that has been signed off on by BLM. And BLM regs say that BLM has the option of approving the application as submitted, and requiring that there be modifications or conditions, or the option of disapproving the APD, i.e., what the lessee gets here is an exclusive right vis-à-vis the rest of the world. If anyone can go out and develop the oil and gas resource, it's the lessee here. But that doesn't mean the lessee can go out the minute the ink is dry on the lease and start developing to his or her heart's content out on the property. There are a number of steps that have to happen in the interim, and there are restrictions on that. Another source of restrictions is the Federal Land Policy Management Act. In case that wasn't already clear from the arguments in our brief, I would point out that the Supreme Court in the Southern Utah Wilderness Alliance case made it very clear that the BLM in all its land resource management decisions, which would include signing off on any applications for permit to drill, has to comply with the Excedent Resource Management Plan. And the Excedent Resource Management Plan here said, you're good, you can go ahead with your application, but you can't do anything beyond that with regard to drilling of test wells and initial small-scale development. But anything beyond that, you can't do until there's initial documentation or further environmental documentation. Could you tell us what small-scale development means? There isn't a precise definition of that document, and it doesn't really come into play here, because the only APDs that were signed off on were for exploratory drilling. Nothing beyond that was ever authorized in the case, in the record before the Court. In that regard, I'd like to go right to talk about the Tongue River Project, which much has been made of in this case. So let me just clarify one point. Now, the trial court held that only small-scale development was permitted, is that right? Under the Resource Management Plan, and that's what the Resource Management Plan said. However, counsel for the appellant is arguing unlimited, from somewhere in the United States, that the APDs are not permitted. Unlimited development is permitted. That seems to be the decision that they're appealing from. Now, did the trial court decide that by implication in some way, or is small-scale development? No. I think it's clear from what the trial court said that it was saying that the lease right isn't unlimited. It's not unfettered. It's bound in part by the Resource Management Plan. The trial court is citing the same sort of facts and laws and lease language that I'm citing to you and saying, look, it's not unfettered. There are certain things that have to be done first. You can't go out and do whatever you please just because you've got a lease for the resource. It's not – it's a right as against the world. If anyone can go out and do it, you can do it. But that doesn't mean you can automatically go out and do it without any further steps. And the trial court understood that clearly. There's no issue about that here. Now, is the 2003 plan before the Court at this time? The 2003 EIS and Resource Management Plan amendment is not before the Court at this time. That is being challenged in, I believe, at last count, seven different lawsuits. But it's not being challenged here. I mean, there are seven lawsuits in district court challenging the 2003 EIS? I believe that's correct. At a minimum, there's five. I think we just got some recent notices in on that. So it's a lot of money. And it would surprise me if this Court gets the opportunity to take a look at that one as well. Are they drilling under Ted Turner's ranch or something? Not as far as I know. I think he's more in the mountains in Montana. We're talking about the southeastern corner here. This is just a big issue in the area, I think, is what this really boils down to. I'd like to talk briefly about the Tongue River Project. The facts of the Tongue River Project are as follows. Between the years 1994 and 1998, Appley Fidelity, its predecessor in interest, Redstone, actually, came to the BLM and said, we're looking in this general area to try to figure out whether there's CBM and commercial quantities here. We'd like you to sign off, approve the following applications for permit to drill. Now, there were a total of 11 over the course of four years. And those were signed off on only after BLM made sure that they conformed to the RMP EIS, only after they did consultation of the National Historical Preservation Act, and only after they did another round of NEPA analysis in the form of environmental assessments. In 1990, at this time, none of these things were the Tongue River Project, because Fidelity was looking, trying to figure out whether there was anything there that made sense to pursue commercially. Apparently, those wells revealed that it did. Fidelity came back to BLM in 1998 and said, we'd like to go forward with something we're calling the Tongue River Project. It's going to be 250 wells, 111 of which are going to be on federal lands, the remainder on private lands. Of those 111, they included in the 11 that were exploratory wells. Those wells have been since shut in, but at the time, they were including them as part of the project. In addition, they wanted to sink another 100 wells. BLM took a look at the proposal, reviewed it, did some analysis, and came back to Fidelity and said, wait a minute, we're talking about commercial development here. We've moved out of what we were willing to allow and what we analyzed in the earlier RMP EIS. You have a couple of options. You need to scale this back so you're not going to have significant environmental impacts. You need to go ahead and do an EIS, and you can do an EIS that's specific to this project or a programmatic, and you can do an EIS or you can drop the project entirely. Is the environmental issue here incidentally taking water out of the ground in order to get the swamp gas out of the ground or putting water into the ground in order to get the swamp gas out of the ground? I don't understand if I understood what it was about. What it is, is it's taking water out of the ground. Coal bed methane. Swamp gas, right? Right. Exactly. It's methane. I found that in the sewer. It's methane gas, which is natural gas that has been trapped in coal bed seams, and it's trapped through a variety of chemical processes that I won't get into here. But it's there under pressure, and the water in the aquifer and in the coal bed holds the gas in. When the gas is drawn out, then the pressure is off the gas and the gas can be drawn out as well. And so one of the issues is drawing that water out and what's going to be done with that water. And again... The issue is if you take out enough water, then it's harder to get good wells? No. The issue is how much water you're taking out, how that's going to affect the aquifers, and what the quality of that... Aquifer means groundwater. Right. Exactly. And that's why I asked. Does it mean you have to drill deeper to get good wells? I think it depends on where the coal seams... Like what effect on the aquifer are you talking about? Well, the point is the water gets drawn out of the aquifer, because that's what's holding the methane in the coal bed. And so that's being drawn out. And there are issues of whether, at least Northern Plains is arguing that there are issues about whether that will dry up an aquifer, i.e. so people who are on ranches may not have enough water for their purposes. There are issues about the quality of the water that's being taken out and what's being done with that, whether it's fresh, clean water or whether it's water that's, for example, more saline and how you're going to dispose of that. What BLM said in the 94 document was... Are you talking about if you do too much of this, you don't have enough water for stock or water for irrigation? That's the argument that Northern Plains is making here. And basically what BLM said was we're only going to allow exploratory levels for the time at issue in this lawsuit, so you don't have those kinds of issues. And with regard to the quality of the water, we're going to establish certain requirements that you have to follow to make sure that there aren't any problems with affecting the quality of surface waters. So that's really the primary issue with coal bed methane. The fundamental point that I'd like to make to the court is the planning process went exactly the way that it's supposed to under FLIPMA, and there was exactly the sort of environmental analysis that was supposed to be here at the stages that are relevant to the time at issue. Everything... I've been working for the Department of Justice for about 10 years litigating these cases, and this is really a picture-perfect example of how the process is supposed to work. They did exactly what they were supposed to do, and when they followed up and were looking at site-specific cases of various applications for permits to drill, they checked back against their documents, made sure that the site-specific proposals fit into the larger EIS. If they didn't, they said, look, we've got a problem, we've got to do something differently here. They did everything exactly the way they were supposed to do. Well, let's say if you did everything wrong in 93-94, where does that put Appellant? I mean, you're claiming that you did everything right and that it's all involved, but if you had done everything wrong, would that put – would that make any difference in your statute – the statute of limitations? No. I mean, if – we argued that the analysis was very adequate, but in fact, Your Honor has an excellent point that even if you did everything right, you still have a problem, and even if it had been inadequate, that's irrelevant here because of the statute of limitations problem, because of their failure to pursue comment at that time to say, look, your analysis isn't working here, there are the following problems. So that's something that the court doesn't even need to reach. In short, I'd ask that the court uphold the district court's decision to grant summary judgment to the government and appellees here. Thank you. May it please the Court, I am John Mitropoulos. I represent the industry appellees here, and I appreciate your time. Welcome to the Northwest and the water wars we have in Montana. I'd like to answer some – or address – Is that what this is about, the water? It is about the water. The water does hold the cobalt methane, the swamp gas, and what's called cleats in the coal seams, and to decrease the pressure, to depressurize that and allow the gas to migrate upwards in a well, you have to depressurize some of the water. You don't dewater the aquifer, and it's not permanent, but you do have to depressurize it. So then you pump that water out, and the question is two-fold. What impact does that have on wells in the area, and what do you do with the water you pump out? Neither of those issues are at issue here, and they've received, I'd say, tens of thousands of pages of studies, and they're not getting to everybody, and millions, if not billions of words in Montana in the last three or four years. And I think Ms. Kwas is correct. This Court will probably hear at least one of the pending five challenges to the 2003 EIS that came out, but that's not an issue here. I would – I did look at my brief and counted up the cases. There are five cases pending in Montana and Wyoming to this EIS. There's two other cases, which may be why she thought there were seven pending challenging specific decisions by BLM. But as I say, they're not at issue here. I'd first of all like to address a point Judge Bertelsman made about the trial court's holding, and I think you are absolutely correct. The trial court looked at what actually happened, looked at the regulations, looked at the RMP, and said what industry received is a right subject to the RMP. And the Supreme Court in SUA recently, I think it was June 14th, agreed completely with that holding. The Supreme Court said RMP's control. And so the rights that my clients received were subject to the RMP, which said only some testing and small-scale development would be allowed. Now that's – I'd term that somewhat the theoretical context, maybe the legal context. The factual context is that there were leases issued subject to this RMP, and the only thing factually that occurred under that 94 RMP is 11 APDs, approvals to drill, were issued. Those were for exploratory purposes. All of those wells have been capped or shut in. What that means is I think five of them have been abandoned because they're not – or they don't appear to be fruitful for gas-developing purposes. The ones that weren't abandoned were capped, and they haven't even been put online yet in a development, in an economic development. So as a factual matter, I think it's clear not even small-scale development occurred as a result of this RMP. It occurred as a result of BLM's decision-making. So what you had is seven exploratory wells, five failed, two are capped, but they may have succeeded. We don't know. I believe it's 11 exploratory wells and five failed. What would that leave? My math is bad. Four – no, seven, six were successful. But I do think you're right, Judge Bertelsman, that the appellants are ignoring the district court order. They have, throughout their brief, in somewhat of a thematic manner, stated that what BLM did is open the door to full-scale development. The district court said they did – BLM did not do that, and the facts show that BLM did not do that. In a way, it seems like the appellants are trying to convince you that, you know, they're not going to do that. Katie barred the door. It's all over. All the decisions are over with. And clearly that's not the case, since we had a 2003 EIS that just came out. Now, I see I'm less than a minute out from the conclusion of my argument. Let me just point one economic thing out. Another thing that the appellants seem to want you to believe is that CBM was there, everyone knew it was there, BLM knew it was there, and it had to be, and all they had to do was say, go ahead and go get it. That's not the case. Corporations don't invest the millions and millions of dollars it takes to get that sort of resource out of the ground without doing exploration. And that's exactly what happened here. Eleven wells, and they went and got the information. And based on that, then they came back and said, we'd like to do actual development. And as Ms. Kwas pointed out, that resulted in a full-scale EIS, which came out finally in 2003. I appreciate your attention today. If you have any questions, I'd be happy to try to answer them. Thank you, counsel. First, I would like to address the proposition that there will be further steps in the development. There will be applications for permits to drill. This is exactly the same as Conner v. Burford, where the Ninth Circuit said, even though there will be further steps in the lease process that can result in some minor conditioning, it's at the time you issue the lease that you issue the rights to drill. I don't get it. I look at the 94 statement, and it says, in order for full-field development to occur on federal oil and gas lands, an additional environmental document tied to this amendment would be required. And then it looks like in 2003 they did do the additional environmental document tied to the development. Everything should be fine? Well, I don't know. Let me read from that document. It depends on how the challenges to the 2003 environmental impact statement go. Maybe you'll win. Maybe you'll lose. I don't know. Well, we won't even get in the courthouse door, because at page 1012 of the record, this is the 2003 EIS. This is BLM in their final EIS, and here's what they say is on the table. They say, the existing lease stipulations approved in the 1994 record of decision continue to be applicable to all CBM development. Existing oil and gas leases include the right to explore and develop CBM. That's under alternatives considered but not analyzed. Why aren't they going to look at it? Because they've already given the right to develop CBM to the oil companies. And this whipsaws the ranchers that we represent. But that would be in violation of what the trial court held. Well, that's why the trial court got it wrong, because the trial court misconstrued what the actual decision. When you go back to the 94 decision, take a look at it. Where the actual decision is, the decision is we're going to sort these lands into three categories or four categories. Standard lease stipulations, minor stipulations, major stipulations, no surface occupancy. They did that sorting. And in that sorting, they decided that these lands would be open to development. But when they looked at the environmental impact of it, they realized that CBM was still on the horizon, and they didn't really understand what was going on with CBM. So they said we're going to do some further analysis. Now, they don't say they're going to do an EIS. It could be a one-sentence hydrological analysis, and they don't address the question, have we given the development right? Do they have the absolute right to develop? You can do a further environmental analysis, yes, and there may be some minor tinkering around the edges. But if they have the right to develop, and they conferred it in 1997 when they signed the lease. What the 94 environmental impact statement said, it said exploratory, wells, and small-scale development. Evidently, they decided back before the limitations period that is open to you to challenge that small-scale development is necessary in order to tell whether the methane is there in sufficient quantities and accessibility to be worth exploiting. And if the answer was no, that's the end. If the answer is yes, then they do another environmental impact statement. I have four things to say to that. First, the actual record of decision says these lands are open subject to standard lease stipulations. Second, the language they cite is from the language in the EIS about items that are on the cutting room floor. We're not even going to get to this. We're not going to study it. We're not going to look at it. Third, when BLM issued these leases, they didn't include any stipulations or any contract terms that restricted development by stipulation. And fourth, when you look at these ones you decide that a particular well is by its nature exploratory or small-scale, why would you have to say more? They can't pull out all the gas under Montana with the one well you've given a permit for. Let's just look at what BLM did and the track record. It's in the record. We cite it in our brief. First of all, in 1994, they promised that they would do more environmental analysis. When they did that analysis in 2003, they said we already conferred when these leases were issued the development rights. Second, why did BLM need to suspend any of these lease rights when the oil companies came forward and said, gee, we can't develop for coal bed methane. We want our rights suspended. The correct answer to the oil companies would be you've got no right to develop. And yet the record is, and they ironically argue in their briefs, gee, our rights were suspended. But there's nothing to suspend if you have no right. And finally, when Fidelity came forward and said we've got a full field development proposal we want to go forward with, BLM didn't look at the record. BLM didn't say you've got no rights to develop. BLM said, wait a second, we've got a little bit more paperwork to do, and you've got a right to develop. And that whipsawed the clients that I represent because they never had their day in court before this contract was entered into where they could say protect my water source or protect my ranch operations. I think you perhaps had a question. Isn't there a remedy for that to go back to the district court and join them from exceeding the permit, from which they did not appeal when the trial court decided what its conditions were? We've got ‑‑ our appeal is that these leases were void at the time of issuance because they granted a right for CBM to develop and they didn't restrict it, and that was wrong, and they didn't do the environmental analysis. The trial court says they did restrict it. The trial court did, and that's why we've appealed the case. And we're hoping for a different result here. In my view, you're arguing some other case than the one that's before this Court. Well, I think I've explained why, from our standpoint, there's a choice here between ranching and co‑bed methane development, and it involves the water. And these ranchers have never had their day in court on what lease stipulations will protect their ranch, and under the government's theory, they never will have their day in court because the lease rights were already conveyed. Thank you, counsel. Northern Plains v. BLM is submitted.
judges: Kleinfeld, Callahan, Berterlsman [E. Kentucky]